IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)


IN RE MASEK CHILDREN'S TRUST


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE MASEK CHILDREN'S TRUST.

MARK A. MASEK ET AL., APPELLANTS AND CROSS APPELLEES,

V.

BARRY M. MASEK, APPELLEE AND CROSS APPELLANT,

AND COLLEEN A. EAMES, APPELLEE.


Filed May 14, 2019.    No. A-18-408.


Appeal from the County Court for Gage County: STEVEN B. TIMM, Judge. Affirmed.

Brian S. Koerwitz, of Endacott, Peetz & Timmer, P.C., L.L.O., for appellants.

Douglas W. Ruge II for appellee Barry M. Masek.

William E. Seidler, Jr., of Seidler & Seidler, P.C., for appellee Colleen A. Eames.


PIRTLE, ARTERBURN, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Five siblings were cotrustees and beneficiaries of a trust whose sole asset was farmland located in Gage County, Nebraska. Three of the siblings, Mark A. Masek, Diane M. Yahiro, and Richard C. Masek (Petitioners), allege that the oldest brother, Barry M. Masek, represented that he would manage the trust, failed to manage the trust with sufficient care, and that his violation of that duty caused damages. Finding that there was insufficient evidence that Barry undertook the duty to manage the trust, and that Petitioners were in pari delicto with Barry, we find that

Petitioners may not pursue a claim for breach of fiduciary duty against Barry in his capacity as trustee. For the reasons stated below, we affirm.

## II. STATEMENT OF FACTS

### 1. TRUST FORMATION AND MANAGEMENT PRIOR TO LAWSUIT

Patricia and Charles Masek, parents of the parties to this action, owned a farm with several hundred acres of farmland in Gage County, Nebraska. After Charles died in 2000, Patricia gifted an equal and undivided interest in the farm to her children, Barry, Mark, Dianne, Colleen Eames, and Richard.

In November 2000, the Masek children formed the Masek Children's Trust to hold the farm and transferred the farm to the trust. Barry, who is a CPA, and Mark, who is a tax attorney, took the lead on working to prepare the trust with David Lepant, who had previously served as their parents' attorney. When a draft of the trust was ready to send to Colleen and Dianne, Barry included a note which stated that the trust was being established for estate tax purposes. In the note, Barry also stated that he would take care of "miscellaneous trust administration: bank checks, pay bills, etc." but that major transactions such as disbursements would require majority approval. Although Richard was a beneficiary and grantor, and was formally a trustee, he was left out of most conversations about the farm. Lepant stated that he was almost certain Richard had no input in the trust's formation because Richard "just is not the type of a person that would have an opinion probably on this sort of thing . . . I am not sure that he has the mental capabilities to do that."

When the trust was formed, each sibling was named as a grantor, a trustee, and a beneficiary. The trust's sole income was the rental income from the land. The trust allowed income to be paid out equally to the siblings during Patricia's lifetime, but the principal was to be held in trust until after Patricia's death, except that, upon the majority vote of the trustees, the principal could be "paid out [during Patricia's lifetime] for the benefit of a charitable organization, including hospitals, nursing homes, or other organizations existing for the health and well-being of the aged." Barry testified that the purpose of these provisions was to provide for Patricia in her old age. The trust conferred certain powers in the trustees, including the power to lease trust property. The trust also contained a "Right of Withdrawal" feature which allowed any of the beneficiaries to demand a withdrawal of their interest in the farmland which would then require all beneficiaries to withdraw their proportionate share of the farmland.

In the early 2000s, Barry paid Patricia a $1,000-per-month management fee from the trust account. Email correspondence among the siblings, excluding Richard, demonstrates that Mark and Dianne were aware of these payments and had evidently discussed them with Barry in advance. Barry testified that, at some point, Patricia decided she did not need the management fee and would rather leave the money in the trust and continued to manage the farm without a fee.

Near the end of 2013, the four siblings began to discuss withdrawing the land from the trust. Mark thought that separating it might be preferred and stated "If this is the collective view, then I suggest that any separation occur after Mom moves to Dianne's in March." Barry responded, expressing his reservation because "The farm is not ours until Mom is gone- physically or mentally. And she/we may need to sell some pieces if she needs the money [for a nursing home.]" The record does not demonstrate that anyone questioned or challenged Barry's statements at the

time. A few days later, in an email to Dianne, Mark expressed his view that Barry was not keeping them up to date on farm matters. He then said that "I want to get Mom and Rick to your house. Then in the summer have a joint call to collectively discuss rent and any other matter."

In 2014, Patricia moved from her home near the farm to live with Dianne. That same year, Barry, acting pursuant to Patricia's direction, contacted long-term farmland tenants Ronald and Richard Zarybnicky and Brian Vitosh regarding rent for 2014, which yielded a small increase in revenue. The Zarybnickys and Melvin and Vitosh had been tenants of the farmland dating back many years before the farmland was gifted to the siblings and transferred to the trust. In 2014, the Zarybnickys paid $72 per acre of cropland and Vitosh paid a similar rate. None of the siblings did anything to raise rents for 2015.

In May 2015, Mark asked about the rent they were charging per acre, and Barry provided the information. Mark made some rough estimates of the land's rental value and determined that the trust had forgone roughly $300,000 in potential profits. Barry disagreed with Mark that there was a problem because he claimed the rents were set in accordance with their parents' wishes. Mark hired an appraiser to determine the fair market rent value of the farm. After hearing from the appraiser, Mark wanted to charge $150 per acre for the farm's better land and $135 per acre for the other cropland. Dianne agreed, but Barry and Colleen had reservations.

In June 2015, Mark contacted the trust's tenants and informed them that their oral leases would not be renewed for the 2016 season, and provided written leases with cropland prices of $135 and $150 per acre. Although both the Zarybnickys and Vitosh signed the leases, they were informed that the leases would not be final until signed by all trustees. Barry still had reservations, and in July, Barry suggested setting the rental rate at $25 per acre less than the rate Mark had negotiated and telling the tenants that the price would increase the following year.

## 2. PLEADINGS AND RENT HEARING

In August 2015, the Petitioners brought an action to remove Barry as trustee and to recover for the trust's losses that they alleged he had caused. The petition alleged that: Barry was a certified public accountant, represented he was qualified to manage the trust, and on that basis they agreed to allow him to be primarily responsible for managing the trust; despite the trust requiring approval of all trustees to lease land, Barry unilaterally leased the trust's land at rates far below market value; and even after Mark confronted Barry about leasing the land at market value, Barry attempted to lease the land at below market value for the 2016 farming season. Petitioners alleged that this was a breach of Barry's fiduciary duty as trustee, that the trust received $275,000 less in rental income as a result of Barry's breach, and therefore Barry was liable for the loss. Petitioners also sought costs and attorney fees.

Barry filed an answer denying damages or that he breached his fiduciary duties. He pled that Patricia had managed the farm and denied that he undertook to manage it. He filed a counterclaim for the same damages that Petitioners sought from him, alleging, in substance, that if he was guilty of anything, so were Petitioners. He also pled that Richard did not have the capacity to initiate this action and that Mark and Dianne had overreached and exercised undue influence in bringing the action in his name and requested that a guardian ad litem be appointed for Richard. He also requested the parties be removed as trustees and a corporate trustee appointed.

Colleen filed a response to the petition. She was in substantial agreement with Barry regarding his liability and also pled that Patricia had managed the farm. She requested that the court remove the siblings as trustees and appoint a corporate trustee. She also asked the court to reform the trust to provide that all distributions of income or principal to the beneficiaries be equal and to include a termination provision.

In February 2016, the court held a rent hearing. Barry and Colleen argued that setting the 2016 rent at $150 and $135 per acre was too high and they might lose their tenants at that price. Barry expressed concern that, as absentee owners, they would not know how the farm would be cared for if they found a new tenant. He opined that a rent of no more than $125 and $110 per acre for the land types would be more appropriate. Tenants Ronald and Richard Zarybnicky testified that, until 2014, they had not really negotiated a price since the trust was formed; Instead, they paid what they thought was fair and paid a little bit extra when they had a good year. The Zarybnickys generally increased the rent slightly on their own as time went on and expressed their worry that with low crop prices, they might lose money that year with such a high rent, and might be forced to look for cheaper land in the future. At the close of the rent hearing, the judge offered that if the parties would agree, he would set the rent for cropland at $125 per acre. Counsel for all of the trustees agreed to the rate, which was adopted for 2016. The parties were not required to agree on a 2017 rental rate because in August 2016, the court appointed a bank as trustee and removed the siblings as trustees.

### 3. TRIAL

Trial was held over several days in 2017. Factual issues contested at the trial included whether Patricia actually managed the farm and whether Barry represented he would manage the trust. Additionally, Mark and Dianne presented some evidence that Barry may have had ulterior motives in refusing to sign the leases that Mark prepared for the 2016 growing season.

### (a) Petitioners' Testimony

Mark testified that after Charles, their father, died, Barry and Mark worked with attorney David Lepant to prepare the Masek Children's Trust. He said Patricia was not a beneficiary of the trust. When asked about the provision that the principal could not be distributed until after Patricia's death and the provision for the giving of gifts to organizations that care for the elderly, he made no connection between them and claimed the gift provision was not for Patricia's benefit.

Mark testified that Barry told him he would manage the farm, but did not specifically say he would set rent with tenants. He testified that the siblings never had a meeting where they discussed Patricia managing the farm and, to his knowledge, Patricia never expressed a preference or opinion about rent prices. In an May 17, 2015, email, Barry stated he agreed with Mark that "It's really still Mom's farm and Mom's money," and Mark testified that he did not say that, but did not contradict Barry in that email chain.

In a May 23, 2015, email, Barry stated "[a]s you may remember, Mom handled all farm matters: the rents, rent checks, and worked with the renters." Mark responded that "I was vexed when I read that an elderly widow with a retarded son had been meeting with the renters, handled all rent matters [and managing the farm]" and then said that he would "take that over for her"

- 4 -

because she was no longer able to take care of faming matters. Mark testified those statements and much of the email was sarcasm because he thought it was clearly false that Patricia could be managing the farm. Mark also said he saw Barry's email as an attempt to "foist his responsibility onto" Patricia.

Dianne testified that Barry told her privately that he would talk to the renters and manage the trust, but admitted that he did not say specifically that he would negotiate rent. She testified that she did not do her own research about what the rent should be set at until 2015, even though Mark suggested they discuss rent in 2013.

Richard testified regarding his observations of the farm's management. He testified that he lived with his mom and, in 2000 and 2001, he observed her negotiate rent, but not after that time. He said that Patricia would forward requests to hunt or fish on the land to Barry. He testified Barry had him sign papers for the Farm Service Agency on behalf of the trust. When Barry was visiting, he asked Richard if he knew anyone who did tree removal because the county had contacted him about removing some trees near the road. Richard also testified that the Natural Resources Division (NRD) sent Barry a letter about trees and shrubs growing in the spillway of the watershed dam, and Barry found someone to do the work and asked Richard to sign related papers. Richard believed that Barry was managing the farm but Barry did not tell him he would manage the farm.

### (b) Barry and Colleen's Testimony

Petitioners called Barry as a witness. Barry testified that he never said he would manage the farm, that Patricia managed the farm through 2013, and his role was limited to taking care of the checkbook and some administrative matters on behalf of the trust including working with government entities such as NRD and the Gage County Highway Department. He further testified that Patricia had been setting rents and he did not research whether the rents were fair. Despite contacting tenants to set rents in 2014 for the 2014 season, he did nothing to raise rents from 2014 to 2015. Barry also acknowledged that, in his deposition, he had stated that the main reason he did not sign the 2016 lease Mark prepared was that Mark and Dianne had sued him.

Colleen testified that she did not want to raise the 2016 rent to $150 because she felt that doubling rental land in a year was not the right thing to do and she believed the tenants had been good tenants for many years. Colleen visited and talked with Patricia often and testified that she was aware Patricia was negotiating rents based on a few conversations with her.

### (c) Testimony by Nonparties

Petitioners also called Lloyd Dickinson, tenants Ronald and Richard Zarybnicky and Brian Vitosh, and lawyer David Lepant as witnesses. Dickinson provided an appraisal for the rental value of the trust property estimating the fair rental value of the farm to be about $150 per acre in each year from 2012 to 2016.

The Zarybnickys testified that they did not negotiate rent with anyone for years. Ronald testified they raised rent on their own until Barry talked with them about rent in 2014. Vitosh testified that prior to 2014, he never dealt with Patricia or Barry regarding rent and, when asked if

he "never raised rent or it just kind of carried on on its own," Vitosh responded that he was not sure.

Lepant, the attorney who drafted the trust, testified that he performed legal work relating to the farm since before Charles died in 2000. He testified that he believed that Patricia managed the farm, but was not aware of any agreement for her to do so. After Charles died, Patricia worked with Lepant on legal work for the farm including boundary issues dating back before the trust was created. Lepant testified that this work continued into at least 2007.

### 4. TRIAL COURT'S ORDERS

In its order, the county court found that Petitioners did not meet their burden to show that Barry agreed to manage the trust and concluded that all trustees shared equally in any fault for losses at least until 2015, and that in 2016, the rent was set by court order. The court further found that Barry's counterclaim had not been proven by a preponderance of the evidence. The court did not reform the trust, but did state that "Colleen's request that the court reform the Masek Children's Trust has merit but, because of the doctrine of unintended consequences, I am reluctant to do so without further input from the other parties including the successor trustee." The court prohibited amendment of the trust and distributions from the trust without court approval.

The parties moved for attorney's fees. Following a hearing, the court ordered Petitioners to pay their own attorney's fees, half of Barry's attorney's fees in the amount of $40,884.38, and Colleen's attorney's fees in the amount of $49,420.00. Petitioners were also ordered to pay their own costs, Barry's costs in the amount of $2,592.76, and Colleen's costs in the amount of $1,708.40. Petitioners timely appeal the judgment as well as the award of attorney's fees, and Barry cross-appeals seeking to have Petitioners pay all of his attorney fees.

## III. ASSIGNMENTS OF ERROR

Petitioners' assignments of error, combined and restated, are that the trial court erred: (1) in failing to find that Barry had breached his fiduciary duty and awarding Petitioners damages against Barry for the breach, (2) in failing to award damages against Barry in favor of petitioner Richard, and (3) in awarding attorney fees and costs to Barry and Colleen instead of awarding fees and costs to Petitioners. Barry cross-appeals contending that the trial court erred in failing to award him all of his attorney fees.

## IV. STANDARD OF REVIEW

Appeals involving the administration of a trust are equity matters and are reviewable in an appellate court de novo on the record. *In re Trust of Alexis*, 16 Neb. App. 416, 744 N.W.2d 514 (2008). When credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *In re R.B. Plummer Memorial Loan Fund Trust*, 266 Neb. 1, 661 N.W.2d 307 (2003).

When an attorney fee is authorized, the amount of the fee is addressed to the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion. *In re Estate of Forgey*, 298 Neb. 865, 906 N.W.2d 618 (2018). A judicial abuse of discretion

requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id*.

## V. ANALYSIS

Petitioners claim that Barry violated his duty as trustee because he claimed he would manage the trust and failed to do so. As explained below, the trustees as a group did not delegate management functions to Barry. All trustees therefore had an equal duty to manage the trust, and if Barry violated his duties, the other trustees are equally responsible for violating theirs.

### 1. BARRY'S LIABILITY AS MANAGER

The Uniform Trust Code contemplates the delegation of management of a trust to a trust agent. Under Neb. Rev. Stat. § 30-3888(c) (Reissue 2016), a trustee who delegates management functions to an agent will not be liable for the actions of the agent if the trustee complies with § 30-3888(a), which reads, in part:

The trustee shall exercise reasonable care, skill, and caution in:

(1) Selecting an agent;

(2) Establishing the scope and terms of the delegation, consistent with the purposes and terms of the trust; and

(3) Periodically reviewing the agent's actions in order to monitor the agent's performance and compliance with the terms of the delegation.

In performing a delegated function, an agent owes a duty to the trust to exercise reasonable care to comply with the terms of the delegation. § 30-3888(b).

Mark and Dianne testified that Barry agreed he would manage the trust and Petitioners cite to functions Barry performed, such as dealing with Gage County and other government entities on behalf of the trust, as evidence that he managed the trust. In contrast, Barry and Colleen denied Barry agreed to manage the trust and argued that management of the trust remained vested in Patricia. Further, Mark and Dianne concede that Barry never specifically told them he would be responsible for leasing trust property and admitted that they were aware that Barry paid Patricia a management fee on behalf of the trust. Additionally, the tenants testified that no one negotiated rent with them dating back before the trust was created through 2014.

Emails among the siblings, excluding Richard, demonstrate that all of the siblings had knowledge that Patricia remained involved with the farm. For example, Mark expressed that the siblings should meet after Patricia moved from her house by the farm to Dianne's house in Chicago to discuss rents and other matters. Around the same time, he expressed an interest in dividing up the land, but suggested it be after Patricia moved. Barry responded that he was not in favor of splitting up the farm, noting that "[t]he Farm is not ours until Mom is gone- physically or mentally." No one objected to this statement. In May 2015, at about the time Mark first raised an issue governing the rental rate for the farmland, Barry stated that he agreed with a remark made by Mark a few years earlier, that the farm really belonged to Patricia. Mark did not object to this statement. Finally, in 2015, after Mark estimated the lost income to the trust for charging below market rents, Barry stated that "[a]s you may remember, Mom handled all farm matters: the rents,

rent checks, and worked with the renters." Mark responded saying he was vexed to learn she was handling those things, and at trial disavowed most of the email, claiming it was sarcasm in response to the clearly false assertion that Patricia had been dealing with renters. Finally, we note that Patricia was paid a management fee for a time and Colleen testified that Patricia remained responsible for farm management.

While we review the trial court's determinations de novo, we are entitled to rely on the trial court's determinations of credibility and resolve conflicts in the evidence in favor of the trial court's order. We find the evidence wholly insufficient to support the petitioner's theory that trust management was delegated to Barry. As such the petitioner's claim that he violated a fiduciary duty to the trust in that capacity fails.

## 2. BARRY'S LIABILITY AS TRUSTEE

The Nebraska Uniform Trust Code states that trustees owe the beneficiaries of a trust duties that include loyalty, impartiality, prudent administration, protection of trust property, proper recordkeeping, and informing and reporting. *In re Conservatorship of Abbott*, 295 Neb. 510, 890 N.W.2d 469 (2017). A trustee shall administer the trust as a prudent person would, by considering the purposes, terms, distributional requirements, and other circumstances of the trust. Neb. Rev. Stat. § 30-3869 (Reissue 2016). In satisfying this standard, the trustee shall exercise reasonable care, skill, and caution. *Id*. Every violation by a trustee of a duty required of it by law, whether willful and fraudulent, or done through negligence, or arising through mere oversight or forgetfulness, is a breach of trust. *In re Robert L. McDowell Revocable Trust*, 296 Neb. 565, 894 N.W.2d 810 (2017).

A cotrustee must participate in the performance of a trustee's function unless the cotrustee is unavailable to perform the function or the cotrustee has properly delegated the performance of the function to another trustee. Neb. Rev. Stat. § 30-3859 (Reissue 2016). As discussed above, there was no delegation of the duty to negotiate rents to Barry. All of the trustees were charged with the administrative function of leasing the farmland, but none of them raised the issue of the trust charging below market rents until May 2015. If there is legal fault for charging below market rent, all of the trustees share in that responsibility.

As the Nebraska Supreme Court stated in *Chambers v. Martin*, 165 Neb. 482, 486, 86 N.W.2d 49, 51 (1957):

> The Court of Appeals of Kentucky has held: "It is where the party seeking relief is wholly guilty of fraud, or the grantor and grantee equally acted wrongfully or illegally, i. e., are in pari delicto, that a court of equity will leave him or them where they are to abide the consequences of the wrongdoing."

Because we find that, even if the trustees breached a duty to the trust by charging below market rents for the farmland, a matter we need not determine, the Petitioners equally bore responsibility under the terms of the trust. As such, we decline to determine whether Barry breached his duty because Petitioners would merit no relief, being in pari delicto with Barry.

### 3. BARRY'S LIABILITY FOR 2014-2016 CROP SEASONS

Petitioners contend that, even if Barry is not liable for losses before 2014, he is liable at least for the losses in the 2014 to 2016 crop seasons based on his negotiation of rent in 2014 and his refusal to sign the lease for 2016. We disagree.

For the 2014 season, Barry did not undertake to negotiate rent until the year 2014, at which point he obtained a slightly higher rent than the trust had received in 2013. None of the other siblings objected to the negotiated rent nor appear to have expressed any interest in doing so notwithstanding their joint responsibility to lease the trust's property under the terms of the written trust document. We find that for the 2014 crop season, if there was any fault for the rental rate obtained, the parties were equally at fault in their failures.

It appears no trustee made any attempt to negotiate rents for the 2015 crop season. Barry's act of negotiating rents for the 2014 season did does not relieve the other trustees of their obligations to be prudent trustees and ensure a reasonable rent was negotiated for the 2015 season. Again, insofar as Barry breached his duties, the cotrustees were equally at fault.

Finally, for the 2016 crop season, Mark negotiated rent with tenants, but Barry and Colleen refused to sign the lease. Barry cited concerns that, with such a large increase in rent, the tenants would look for other land, leaving the trustees to seek tenants they did not know. As absentee owners, Barry expressed concern about locating a tenant with whom they were not familiar. The court ultimately set the rent within Barry's suggested range. Under these facts, we are not persuaded that Barry breached his fiduciary duties to the trust. This assignment of error fails.

### 4. DAMAGES IN FAVOR OF RICHARD

Petitioners assign that the trial court should have awarded damages to Richard even if not awarding damages to the other petitioners. They claim that the county court's findings mandated a finding that, at a minimum, Barry was liable to Richard. The county court found that Richard's "siblings did not believe Richard was suitable to act in a fiduciary capacity, and he did not participate in the drafting of the trust or decisions regarding the trust until he joined with Mark and Dianne in this action."

Petitioners did not raise this argument with the county court. Absent plain error, when an issue is raised for the first time in an appellate court, it will be disregarded inasmuch as the trial court cannot commit error regarding an issue never presented and submitted to it for disposition. *Maroulakos v. Walmart Associates*, 300 Neb. 589, 915 N.W.2d 432 (2018). This assignment of error is therefore not considered.

### 5. BARRY'S ATTORNEY FEES

Petitioners assign that they should not be liable to pay half of Barry's attorney fees as awarded by the court. They claim that Barry was not substantially successful because he was not awarded relief on his counterclaim and that they had a duty to bring an action to redress and prevent a serious breach of trust. Additionally, they blame Barry and Colleen for the attorney fees associated with the rent hearing. Barry, on the other hand, claims he was substantially successful and should have been awarded all his attorney fees.

In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney fees, to any party, to be paid by another party or from the trust that is the subject of the controversy. Neb. Rev. Stat. § 30-3893 (Reissue 2016).

We find no abuse of discretion. Because Barry had a business reason to seek lower rent and was ultimately successful at the rent hearing, we cannot say he was unreasonable to refuse to approve a $150 per acre lease. His counterclaim did not raise new issues, but was simply a form of claiming that the parties were in pari delicto. Finally, we note that before the action was commenced, Barry was willing to raise rents to approximately the same rate they were finally set by the court in 2016, and then to raise them again. Any benefit to the trust from this litigation has been is dwarfed by the attorney fees. Mark and Dianne brought a suit to recover from Barry for losses in which responsibility they shared. While litigating to set the 2016 rent appears to have been a reasonable attempt to increase trust revenue, suing one trustee for collective misfeasance was not reasonable, and the court only awarded Barry half of his attorney fees. We do not find that the arguments against charging Petitioners with Barry's attorney fees are entirely without merit, but we find that valuing them at half of Barry's attorney fees was within the discretion of the trial court. This assignment of error fails.

## 6. COLLEEN'S ATTORNEY FEES

Petitioners claim that because they did not sue Colleen and because Colleen was not successful in having the trust reformed, Colleen should be liable for her own attorney fees. We disagree.

Colleen's pleading requested that the court remove the siblings as trustees and appoint a corporate trustee. She also asked that the court reform the trust. She wanted the trust to provide for only equal distributions of income and principal to the five siblings and include a termination provision. She was substantially successful. The court removed the individual trustees and appointed a corporate trustee, as Colleen sought. While the court stated it would not reform the trust, it entered an order "prohibiting amendment of the trust or distribution of income, principal, or trust assets other than equally unless such action is approved by the court." This did not include a termination provision, but did, in substance, reform the trust to require equal distributions as Colleen asked. Finally, we note that the court stated that "Colleen's request that the court reform the Masek Children's Trust has merit but, because of the doctrine of unintended consequences, I am reluctant to do so without further input from the other parties including the successor trustee," indicating the court was open to a later reformation of the trust. Colleen was not sued directly, but was still brought into the lawsuit against her will. She was successful on most of what she sought and the court was open to reforming the trust in the future. We find that she was substantially successful and the county court did not abuse its discretion in awarding her attorney fees.

## 7. PETITIONER'S ATTORNEY FEES

Having found that Petitioners are liable for Barry's and Colleen's attorney fees, we find that they were not entitled to attorney fees.

## VI. CONCLUSION

In sum, the siblings did not properly delegate management responsibilities to Barry and therefore insofar as Barry may have violated his fiduciary duties as trustee, Petitioners were in pari delicto with him and are not entitled to damages. Additionally, we find no abuse of discretion on attorney fees. Therefore, the judgment of the county court is affirmed.

AFFIRMED.